IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 8, 2010 Session

ROGER DALE RAPER v. JOHANNA RAPER

Appeal from the Chancery Court for Monroe County
No. 15, 850     Jerri S. Bryant, Chancellor

No. E2009-02345-COA-R3-CV - Filed February 2, 2011

In this divorce case, the trial court granted Roger Dale Raper ("Husband") and Johanna Raper ("Wife") an absolute divorce, thereby ending their 26-year union. A bench trial was held to resolve the remaining issues of property division and alimony. The court divided the marital property and awarded Wife alimony in solido and alimony in futuro. Husband appeals and challenges each of these determinations. We affirm.

Tenn. R. App. P. 3 Appeal as of Right ; Judgment of the Chancery Court
Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Barry K. Maxwell, Madisonville, Tennessee, for the appellant, Roger Dale Raper.

John Carson III, Madisonville, Tennessee, for the appellee,  Johanna Raper.

OPINION

I.

Husband and Wife were married on September 9, 1983. It was the first marriage for Husband and the second for Wife. Two sons were born to the parties' union, only one of whom was still a minor at the time Husband filed for divorce in February 2008;[1] the parties' eldest son was 23 and married with a family. When the complaint was filed, the youngest

---

[1]The youngest child was born on January 8, 1991; hence, he was 17 when the complaint was filed. He had turned 18 by the time of trial.

of the parties' sons was 17 and preparing to enter college on a full scholarship. In his complaint, Husband alleged irreconcilable differences and, in the alternative, inappropriate marital conduct. In her answer, Wife denied that she was guilty of inappropriate marital conduct. She filed a counterclaim alleging that Husband was guilty of inappropriate marital conduct and another ground. In June 2008, the parties reached a partial agreement whereby Wife was to be named as the primary residential parent of the younger child and setting Husband's child support obligation. In answer to Wife's counterclaim, Husband conceded that he was guilty of inappropriate marital conduct.

Shortly before the July 21, 2009, trial date, Wife moved for a continuance. The parties appeared for trial and Husband agreed to stipulate that Wife had grounds for divorce provided they were divorced that day. The court complied by granting the divorce; it went on to set a trial on the remaining issues.

Two days before the scheduled August 2009 bench trial, Wife amended her complaint to include a request for spousal support. At the time of trial, both parties were about 50 years old.[2] At the outset, Husband conceded that he was nine months in arrears on his previously-ordered child support obligation. He proposed that Wife be awarded additional assets in the property distribution to settle his arrearage.

The proof showed that Husband, at the time of trial, had been employed as an over-the-road truck driver for a Madisonville trucking firm since March 2009. In that position, he earned a gross income of about $2,900 a month or $35,000 a year. Before being laid off in January 2009, Husband had previously held a position with Sea Ray Boats earning between $40,000 and $46,000. Husband was happy with his truck driver position and had not looked for a higher-paying job.

After graduating from high school, Wife worked at a sewing plant until it closed. She then received a two-year business "certificate" from Cleveland State Community College and, in 2003, obtained a full-time job as a secretary for the Monroe County Board of Education. She also worked part-time each afternoon for the Madisonville Boys and Girls Club. From these jobs, Wife earned a combined income of just over $23,000 a year or $1,624 a month in take-home pay. Wife drove an 11-year-old Saturn with an odometer reading of over 150,000 miles. She anticipated having to purchase another car.

---

[2]Wife testified she was 51; there is nothing in the record indicating Husband's age/date of birth, but in opening statement, counsel for Wife said that "these parties are 50 and have been married for 25 years...."

The trial court heard from both parties regarding the marital assets and debts. Husband agreed he handled the parties' finances during the marriage – his check was deposited directly into the checking account and he paid the bills. Wife was not even an authorized signatory on the checking account. The parties' largest assets were the marital home and Husband's retirement account. In November 2007, the parties refinanced the marital home and consolidated other marital debts into the loan. Husband testified as follows:

> I consolidated a few bank notes that I had and put it all into one payment, because the way it was all spread out, it was just too much to handle for a month. So I re-financed and got it all into one payment, which was a whole lot cheaper as far as the month was concerned."

More specifically, $15,884 was applied to pay off a line of credit Husband had obtained with FSG Bank. According to Husband, he initially used the credit line to buy cattle that he raised "mostly for a hobby." Subsequently, he financed the purchase and repair of a wrecked pickup truck. Husband had taken out the line of credit with Wife's knowledge. The loan was also used to pay off a "joint" credit card used for marital purchases; although the card was in Husband's name, Wife used it to purchase Christmas gifts and they both used it for their travel expenses and to make purchases for their oldest son when they visited him in Michigan. During the marriage, Husband decided to purchase $15,000 worth of farming equipment – including a tractor, hay roller, and hay rake – to start a hay-farming business on a hundred acres of land he leased. Some of the refinanced loan was used to pay off the $4,912 remaining balance on the second mortgage the parties took out to buy the farming equipment. Husband farmed and mowed hay and sold some of it, but kept most of it for his own use. Husband said that over the last several years, he made "a little or nothing" in the side business and had not shown any income on his tax returns because any profits were reinvested into the operation. In summary, the bulk of the new loan went to pay off the $10,000 credit card balance, the $15,000 truck loan, and the $6,000 in debt remaining on the motorcycle. The parties applied the remaining $3,500 to remodel two rooms in the marital home.

Husband agreed that his new girlfriend, Sherry Gregory, was a part-owner of "Personal Mortgage Solutions, Inc.," the company that processed the refinanced mortgage loan at the end of November 2007. Husband was already acquainted with Gregory because she is the mother of the wife of the parties' eldest son. In mid-December, Husband obtained a new cell phone account that he agreed was for the exclusive purpose of communicating with Ms. Gregory. The proof showed that beginning on December 18, 2007, Husband made and received calls to and from Ms. Gregory's number on most days, several times a day.

Husband testified that he began seeing Ms. Gregory about a month after she separated from her husband in December 2007.

As to the marital finances, Wife said she became aware that Husband planned to encumber the home with a second mortgage to purchase farming equipment when she had to go to the lender's office to sign the loan documents. In late November 2007, Husband told Wife he needed to refinance the home in order to consolidate their debts into one monthly payment. At that time, about $5,000 was owed on the original mortgage. Wife acknowledged that she participated in refinancing the house and did not object to the loan at the time, but noted she had no indication that Husband was then unhappy in the marriage. Wife said, "But had I known that, . . . a month later, two months later after I signed the re-finances that he was going to leave me, no, I wouldn't have signed to have the home re-financed." Wife conceded that without the refinancing, the truck, motorcycle and farm equipment loans, credit card balance, and other marital debts would have remained outstanding.

During the marriage, Husband bought a one-and-a-half acre lot from his sister for $3,500; the lot had been part of their father's farmland. Although the deed was only in Husband's name, he intended that he and Wife would own the lot together. In January 2008, two weeks before filing his divorce complaint, Husband deeded the lot to the parties' eldest son and his new wife and they had since built a house on it. When his son had approached him about purchasing the lot, which was valued at $22,000, Husband refused payment for it; he said he originally bought it "with intentions of one or the other [of his sons]" to build a home there, so he deeded the lot to his son and daughter-in-law at no charge: "[T]hey come and asked me what I wanted for it to buy it. I just give it to them." Asked whether he had first discussed the decision with Wife, Husband said, "I'm sure I mentioned it. I can't be a hundred percent, no, but I'm sure she knew about it." Wife said she and Husband had discussed it "years earlier" and decided against conveying it to their son. Wife said at that time, she had expressed her reservations about giving their son the property because he was then living in Michigan.

According to Husband, the value of his 401(k) from his former employment was $83,000 at the time of trial. He explained that the balance had fallen from over $100,000 to as low as $73,000 due to fluctuations in the stock market in recent years. Husband proposed awarding the marital home to Wife, "free and clear," and he would continue to pay the mortgage until it was paid in full. Further, Husband proposed that he be awarded the full balance of his 401(k) account, while Wife would receive her own, small retirement account. In the event the court did not adopt his plan, Husband suggested that the marital home be sold and everything, including the remaining equity, be split "50-50 down the middle" after the proceeds were applied to satisfy the refinanced mortgage.

Wife explained that her retirement account was not a 401(k), but a state pension that would vest in her if she continued to work at her current job for another 15 or more years; it had no present value that could be withdrawn. She had not submitted any job applications since the separation to try to get a better-paying job.

In 2006, Husband bought himself a motorcycle as reflected on the parties' list of marital assets. During the pendency of the divorce, he sold the motorcycle and used the money to purchase a car for the parties' youngest son to use at college. According to Husband, he told his son to get Wife's approval to buy the car and the son did get it "okayed" with her. Wife was present when Husband and their son bought the car.

The parties had agreed to the value and division of nearly all of the remaining marital property. In addition to the $45,000 mortgage, the only other debts were loans for $1,500 and $400 that Wife had borrowed from her family members, with Husband's knowledge, to help their son hire a lawyer and pay a child support arrearage. Husband wanted to keep property including his truck and other items he purchased during the marriage and proposed that Wife be awarded other property or credits to equalize the distribution. Wife told the court that she wanted to remain in the marital home but believed that the debt on property that Husband had purchased for his own use that was rolled into the refinanced mortgage should be Husband's responsibility.

At the conclusion of the trial, the court divided the marital estate. Of a total value of $163,285, Wife was awarded $103,185, and Husband was awarded $60,100. The court further ordered Husband to pay his stipulated child support arrearage of $3,745 over 10 months at the previously ordered amount of $428 a month beginning in September 2009. Lastly, the court awarded Wife spousal support – $15,000 of the mortgage payments Husband was ordered to make were deemed alimony in solido and Husband was further ordered to pay alimony in futuro of $450 a month until the child support arrearage was satisfied. Thereafter, beginning in May 2010, Wife's alimony award would increase to $700 a month.

Husband filed a timely notice of appeal. He essentially contends that the property division was inequitable and the alimony awards were not supported by the evidence presented.

II.

Husband raises the following issues for our review:

1. Did the trial court commit reversible error by inequitably awarding Ms. Raper $91,500.00 in net marital assets and Mr. Raper only $16,500.00 from their two largest marital assets?

2. Did the trial court abuse its discretion, and commit reversible error, in awarding alimony in solido and in awarding alimony in futuro?

### III.

In this non-jury case, our standard of review is *de novo* upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville***, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's conclusions of law. ***Kendrick v. Shoemake,*** 90 S.W.3d 566, 569 (Tenn. 2002); ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996).

A trial court has broad discretion in fashioning a division of marital property. ***Fisher v. Fisher***, 648 S.W.2d 244, 246 (Tenn. 1983); ***Barnhill v. Barnhill***, 826 S.W.2d 443, 449-50 (Tenn. Ct. App. 1991). It has the same broad discretion with respect to an award of alimony. *See **Aaron v. Aaron***, 909 S.W.2d 408, 410 (Tenn. 1995). "An appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." ***State v. Shuck***, 953 S.W.2d 662, 669 (Tenn. 1997) (citing ***Ballard v. Herzke***, 924 S.W.2d 652, 661 (Tenn. 1996)).

### IV.

### A.

Husband challenges the trial court's division of the marital assets as being grossly inequitable. He contends that the trial court improperly relied upon Husband's " 'fault' and un-supported conclusions on his future intentions, based on his finding a girlfriend after the re-financing, in dividing the marital assets and debts." Husband essentially concludes that only an equal division of the marital property is equitable in this case and requests that this Court reverse the judgment and evenly re-distribute the marital property between the parties.

-6-

B.

Dividing marital property is not a mechanical process but rather is guided by carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c)(2005)[3]. *Flannary v. Flannary*, 121 S.W.3d 647, 650-51 (Tenn. 2003); *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003). As previously noted, trial courts have broad discretion in fashioning an equitable division of marital property. *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004); *Fisher v. Fisher*, 648 S.W.2d at 246, and appellate courts must accord great weight to a trial

---

[3]The statute sets out the relevant factors as follows:

1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

court's division of marital property, **Wilson v. Moore**, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996).

Equity does not require that the award to each party be equal. **Batson v. Batson**, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). It is not this Court's role to tweak the manner in which a trial court has divided the marital property. **Morton v. Morton**, 182 S.W.3d 821, 834 (Tenn. Ct. App. 2005). Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the statutory factors is consistent with logic and reason, and whether the evidence preponderates against the court's division. **Jolly**, 130 S.W.3d at 785-86. Marital debts are subject to equitable division in the same manner as marital property. See **Cutsinger v. Cutsinger**, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995); **Mondelli v. Howard**, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). In dividing marital debts, courts should consider the following factors: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. **Id**.

C.

In its bench ruling, the trial court explained its property division as follows:

> This is a 26-year marriage. Through no fault of the wife, she is now faced with divorce. The parties have pretty much stipulated the division of their assets. When I take their values as being true and line those up, I get, if I count them, and this is the free and clear numbers, wife was getting about $80,000. It's really about $81,000.00-something. And husband is getting $44,000 in assets, $22,000 of that is the lot that he gave away to the child. Then I deduct what they're paying on for those and I deduct $25,000 of that $45,000 on the parties' home as being the debts on his assets, being the $15,000 for the truck, the $5,000 for the motorcycle, and the $5,000 for the farm equipment. That give husband approximately $20,000 in hard assets and wife approximately $80,000.00, which would be about $60,000 when we consider the debt on that.[4]

---

[4]We note that the trial court's rough estimation of each party's award at the outset of its opinion includes its disposition of the marital home but does not include its distribution of Husband's 401(k), the parties' second largest marital asset.

The Court, in dealing with that division, looks at also the fact that the credit card debt, the truck, and the motorcycle were debts of the marriage . . . . But the Court also is mindful that the husband one month before leaving the wife re-financed these debts and encumbered the house, which he knew he wasn't apparently going to keep. And so I think the most equitable thing to do with those debts is to have those debts follow those assets and be taken off of the equity in the house. That was not a dissipation of an asset, but that was husband's way to combine debts in such a way that he could control the distribution of assets, whether he was upside down on his . . . pickup truck or not.

The lot that was deeded away one month before filing benefitted not only the parties' son, but the girlfriend's daughter. But in either way, it had no benefit to the wife to which she was entitled to half of the benefit. That's why I counted that as a marital asset.

* * *

But when you look at the wife's need in this case, I'm going to order husband to continue to make the house payments and pay the house off. And he'll have 90 days to re-finance the house into his own name. $15,000.00 of that payment or of that debt on the house I will consider as payment for alimony in solido.

* * *

I've looked at wife's budget and husband's budget. Contrary to a lot of budgets I have given to me in court, these both appear to be very reasonable. I realize that husband's eating out at $600.00 a month is a bit high, but in light of what he does for living, that's not unusual, although he can save some money by taking his own meals in a cooler as many truckers testify in court that that's what they do.

To equalize the division of the parties' property, the Court can use the retirement, but the Court doesn't have any information as to its current value. The Court doesn't have any information

-9-

of the tax consequences of realigning that value. And the Court certainly doesn't know what the parties' future needs would be in dividing that asset, whether somebody would need to take it out early or leave it in there until retirement age. The Court, therefore, finds that it's equitable in this case to divide the 401(k) with a 50-50 distribution. And husband will receive an additional $20,000.00 of that retirement account to equalize equitably, but not entirely equal, the parties' property division.

On questions from counsel, the court elaborated on its ruling as follows:

Mr. Maxwell: Did you calculate when you get to the end of all that how much, as far as property division, you know, you were giving us dollar figures or what she was getting, what he was getting:

The Court: I took that into consideration in the property division, yes.

Mr. Maxwell: But what are the final figures as far as –

The Court: I don't have them. I didn't have them written down as final figures because I considered the house as a free and clear asset when I said that she was getting approximately 70 percent if the house was free and clear.

Mr. Maxwell: $70,000.

The Court: Uh-huh. And I tried to equitably divide it by giving him some more money in the retirement account, but not totally because she shouldn't have to cash in her retirement part of that account just for monthly expenses.

### D.

The trial court's division of the marital assets and debts was as follows:

-10-

| Assets and Debts | Value | Awarded to Wife | Awarded to Husband |
|---|---|---|---|
| Marital residence | $70,000 | $70,000 | |
| 2000 Chevrolet pickup truck | 6,500 | | $6,500 |
| 1998 Saturn | 3,500 | 3,500 | |
| 1989 Honda Accord | 800 | | 800 |
| 2006 Suzuki motorcycle | 5,000 | | 5,000 |
| FSG bank account | 200 | | 200 |
| Husband's 401(k) retirement account | 83,000 | 21,500 | 61,500 |
| Lawnmower | 200 | 200 | |
| Tools | 500 | | 500 |
| Wife's state pension fund | 3,686 | 3,686 | |
| Christmas club account | 120 | 120 | |
| 275 Massey Ferguson tractor | 4,500 | | 4,500 |
| New Holland hay roller | 2,000 | | 2,000 |
| New Holland disc mower | 2,000 | | 2,000 |
| Furniture, appliances, etc.[5] | 2,330 | 2,330 | |
| Deer rifle | 100 | | 100 |
| Pool (not working), pump, accessories | 400 | | 400 |
| Metal storage building | 25 | 25 | |
| FSG IRA account | 1,375 | 1,375 | |
| Y-12 Credit Union savings | 49 | 49 | |
| 16-foot trailer | 300 | | 300 |
| 1 1/2 acre lot (Husband deeded to son) | 22,000 | | 22,000 |
| Miscellaneous personal property[6] | 1,600 | 1,350 | 250 |
| Loans from Wife's family | <1,900> | <950> | <950> |
| Mortgage on marital home | <45,000> | | <45,000> |
| Totals | $163,285 | $103,185 | $60,100 |

Wife received approximately 63.2% of the value of the marital property and Husband received approximately 36.8%. Considering the relevant factors in light of the evidence presented, we cannot conclude that the trial court's decision was inequitable.

_____

[5]The category of "furniture, appliances, etc." includes the following with assigned values: living room suite ($400), refrigerator ($300), washer and dryer ($200), televisions ($400), twin bed and chest ($150), digital camera ($300), DVD player ($50), VCR ($50), patio set ($200), cleaning appliances ($80), and deep freezer ($200).

[6]Wife's share of "miscellaneous property" is comprised of the following: linens ($200), cookware ($800), kitchen utensils ($50), and DVD/VHS movies ($300). Husband's miscellaneous property consists of spare truck parts ($250).

In this case, the parties agreed to the values and allocation of most of the marital assets consisting of home furnishings, vehicles, farming equipment and personal items.[7] The trial court was left to divide the parties' two largest assets – the marital home and Husband's 401(k) account.   Husband focuses on only those two assets when he asserts that the trial court "committed reversible error by inequitably awarding [Wife] $91,500 in marital assets and [Husband] only $16,500, from their two largest marital assets." (Underlining in original). The trial court's ruling, however, reflects that it properly considered "the big picture" in allocating the parties' assets and debts.

The trial court began by considering that this was a lengthy marriage – a factor that, standing alone, might support a more equal division of the assets, as Husband suggests. Other factors including age, physical and mental health, and employability also weigh equally in favor of both parties.  Neither did either party bring any notable assets to the marriage or have any significant separate property.  The trial court found, however, that a consideration of wife's financial need, Husband's earning capacity, and both parties' economic situation at the time of the divorce favored a disparate division of the parties' property in favor of Wife.  The evidence showed that Wife worked as she had throughout the marriage, but was operating at a deficit each month.  Husband, on the other hand, earned nearly twice Wife's monthly income, and admittedly was able to continue paying the mortgage and child support and have money remaining each month. Moreover, although neither party had sought different employment since their separation, Husband had a demonstrated capacity to earn a higher salary, while there was no evidence that Wife had an ability to improve her economic circumstances.

In  "not totally" dividing the marital property evenly, the trial court determined that it was equitable for Wife to remain in the marital home and also receive some liquid assets – amounting to some $21,500 from Husband's retirement account – toward her reasonable expenses.  In support of its judgment, the trial court expressly found that Husband's treatment of certain marital assets and debts in the months and weeks before he filed for divorce "was husband's way to combine debts in such a way that he could control the distribution of assets. . . ."

We cannot conclude that the evidence preponderates against the trial court's conclusion that its division of the net marital estate was equitable.  The trial court basically divided the property as Husband had proposed – the house to Wife with continued payment of the mortgage by Husband and the 401(k), albeit less $21,500 to Wife, to Husband.  We disagree with Husband's argument that in so doing, the court improperly considered

---

[7]In considering Husband's argument that the property division is equitable, we have used the value assigned by Husband for any item with a disputed value.

Husband's fault in the demise of the marriage. We think that the court's comments on the evidence show that it properly focused on the *effect*s of the divorce, not the reason for it, in distributing the marital property. The evidence showed that these parties lived a seemingly comfortable, relatively frugal lifestyle together for nearly three decades. The trial court found that Wife was entitled to a greater share of the nest egg the parties had built together based on her needs and the economic circumstance that she unfortunately experienced as a direct result of the divorce. In our view, the trial court also allocated the debts represented by the refinanced mortgage by inferring that some of Husband's financial decisions were made with an eye toward dividing the parties' property in the near future. Our review of the chronology of relevant events persuades us that the trial court was correct in its approach. Furthermore, we note that Husband was awarded certain marital property accumulated primarily for his benefit that he wished to keep in the divorce, but he was effectively held responsible for their related debt.

In summary, the overall equities between the parties support a disproportionate award of the net marital estate to Wife. While many of the relevant factors do not favor one spouse over the other, a consideration of Wife's need, Husband's earning capacity, and both parties' economic circumstances support a greater award to Wife. The evidence does not preponderate against the trial court's property division in this case.

V.

Husband contends that the trial court abused its discretion in awarding Wife alimony; he argues that the evidence fails to demonstrate Wife's need for spousal support in any form. In closing, Husband's counsel argued against spousal support as follows:

> She makes sufficient money to pay her bills. He is going to
> have bills himself. He doesn't make that much more than what
> she makes. The divorce case has been pending for nearly two
> years, or whatever, no request for alimony was made until two
> days ago when a motion to amend was filed. So if it was such
> a necessary thing, you know, then you would think it would
> have been brought to the Court's attention before then.

Tenn. Code Ann. § 36-5-121(d)(2005) governs alimony decisions and states a preference, "whenever possible," for an award of rehabilitative alimony to an economically disadvantaged spouse. However, "[w]here there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, . . . then the court may grant an order for payment of support and maintenance on a long-term basis. . . ." *Id*. Thus, long-term spousal support is intended to provide long-term support to an economically

disadvantaged spouse who is unable to be rehabilitated. ***Burlew v. Burlew***, 40 S.W.3d 465, 471 (Tenn. 2004); ***Loria v. Loria***, 952 S.W.2d 836, 838 (Tenn. Ct. App.1997). The type, if any, and amount of alimony to be awarded is within the sound discretion of the trial court in view of the particular circumstances of the case and a consideration of the relevant factors set forth in Tenn. Code Ann. § 36-5-121(i)(1-12). Those factors are as follows:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Among the cited factors, the "real need of the [disadvantaged] spouse seeking the support is the single most important factor . . . [and next] the courts most often consider the ability of the obligor spouse to provide support." *Aaron v. Aaron*, 909 S.W.2d at 410.

In the present case, in awarding Wife alimony the trial court stated as follows:

> Husband will pay wife – since the house payment will be being paid by the husband, she still has a need of approximately $450.00 a month as long as she's receiving the child support payment also, so husband will pay her $450.00 per month as alimony in futuro. And after the child support ceases in ten months, the alimony in futuro will increase to $700.00 a month. There's no reason . . . the wife['s] standard of living . . . should decrease in such a fashion after this divorce. Her bare bones affidavit of monthly income and expenses will change because she will need a new car with the one she has having such high mileage on it. She may have expenses that come up unexpectedly such as medical or things in the future. The parties had a standard of living that was not extravagant and I think that would be equitable because he has an ability to pay at least $1,470.00 a month at his current income level after child support, and having to share that with his wife would be the equitable thing to do for alimony.

A reading of the court's bench ruling, in its entirety, indicates that the trial court properly considered the length of the marriage, Wife's need, Husband's ability to pay, and the effect of its property division in finding that Wife was entitled to alimony. The proof showed that even after the mortgage payment was removed from her expenses, Wife was operating at a slight deficit each month. After adding such anticipated expenses as a $250 car payment for a replacement vehicle, Wife's expenses surpassed her income by several hundred dollars each month. It is apparent to us that the trial court further considered relevant the parties' standard of living during the marriage and Husband's marital fault in fashioning its alimony award – the court expressly acknowledged Husband's relationship with the girlfriend that had led him to leave Wife and concluded that there was no reason, given Husband's available income, that Wife's standard of living should decrease as a result of the unexpected end of her marriage. As the trial court put it, after 26 years of marriage, Wife, "through no fault of her own," was faced with the reality that she could not maintain her former standard of living on her own. For all these reasons, the trial court found that Wife was entitled to the assistance from Husband that he could afford to pay. The evidence does not preponderate against the trial court's finding.

Lastly, Husband contends, in conclusory form, that Wife has the ability to earn more money than her two present jobs pay, and faults her for failing to make efforts in this direction. In connection with this assertion, we notice that Husband has a demonstrated ability to earn a higher salary, but professed that he was happy being a truck driver and conceded that neither had he looked for a job that paid a salary commensurate with his previous employment. Even at Husband's lower pay rate, he earns nearly twice Wife's income each month. In short, the evidence does not preponderate against the trial court's findings in support of its awards of alimony to Wife. It follows that we are not inclined to disturb the trial court's alimony awards.

VI.

The judgment of the trial court is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of its judgment and the collection of costs assessed below. Costs on appeal are taxed to the appellant, Roger Dale Raper.


_____
CHARLES D. SUSANO, JR., JUDGE